## W. W. Simms *v.* The State.

1. Charge on Circumstantial Evidence. — A proper charge on the cogency of circumstantial evidence is a necessary part of the law applicable to a case wherein the inculpatory proof is of that character; but there is no prescribed formula for an instruction on that or any other subject. If sufficient in substance, and so expressed as to be readily understood by the jury, the requirements of the law in this respect are satisfied.

2. Evidence — Practice. — The admission of immaterial evidence, not objected to, is not necessarily cause for the reversal of even a capital conviction; but it may become such cause if the jury, by imputing undue importance to it, may have been misled to the prejudice of the accused.

3. Accomplice Testimony. — Further than the statutory requirement that the evidence corroborative of an accomplice witness must tend "to connect the defendant with the offence committed," there is no statutory or judicial authority indicative of the characteristics of such corroborative evidence, with respect to its materiality or immateriality, nor indicative of the source from which it must be educed.

4. Same — Charge of the Court. — The language of the provision of the Code requiring corroboration of an accomplice witness, in conjunction with a definition of the term *accomplice*, is ordinarily a sufficient exposition of that subject in a charge to the jury.

5. Same — Evidence. — But the corroborative evidence must tend directly and immediately, and not merely remotely, to connect the defendant with the commission of the offence. See evidence held insufficient in this respect.

6. NEW TRIAL. — Defendant, having been found guilty of murder, moved for a new trial on the ground that a juror, before being empanelled, said that if put on the jury he would hang the defendant. By a counter-showing it appeared that the juror's remark was a mere device to avoid service on the jury, and that he had no bias. *Held,* not error to overrule the motion.

7. MURDER IN THE FIRST DEGREE. — The change made by the Revised Penal Code in the penalty for murder in the first degree had no application or effect in a trial for that offence which was in progress on July 24, 1879, when the Revised Codes took effect. The sixth section of the final title of the Revised Statutes controls the subject.

APPEAL from the District Court of Limestone. Tried below before the Hon. D. M. PRENDERGAST.

The appeal in this case is from a capital conviction for murder in the first degree. The deceased, William Simms, was a brother of the appellant, and was killed at his own house, in Limestone County, early in the night of May 31, 1878. According to the testimony he was a single man, and lived by himself on a stock-farm. Within an hour or two after the murder, sundry persons were notified of it by one Pollock, a neighbor, and went at once to the deceased's house, where he was found dead at his door, having received two buckshot in the side, one in the elbow, and three in the back and hip, besides two six-shooter pistol balls, of which one entered just below the collar-bone and the other in the left side of the breast. The deceased, it is shown, was not on speaking terms with the defendant, and was also at enmity with two of his three other brothers. A lawsuit was pending between the deceased and the defendant. One C. L. Avery was separately indicted, tried, and capitally convicted for the murder of the deceased.

The case made by the State depended upon the testimony of J. T. Plummer, a tenant of the defendant, who implicated himself as an accomplice, and upon that of Pete Williams, a negro, relied on as corroborative of Plummer, and who, at the time of the murder, worked land of the defendant.

Testifying for the State, Plummer said that the appellant talked to him several times about killing the deceased. Appellant told witness on more than two occasions that the deceased would have to be killed, and he did not want to do it; that he would pay $200 to have it done, but if he could not get it done he would do it himself. On one occasion the defendant said this close to a board-pile and corn-pen near his house, and Avery was there. He asked if witness would assist him, and said he would give witness $200, and that if he could not hire it done he would do it himself; that he and William Simms could not live together, and that William would not move, and he could not. Witness put him off, but may have said he would help. Defendant and deceased had a suit and a difficulty; they were fussing a good deal. The evening the deceased was killed, defendant came into the field, passed witness, went towards Pete Williams, and then came and talked to witness about killing William Simms; and they fixed on that evening to do it, because there was a hanging that day at the county-seat, and the neighbors would not get home from it until late. Going to the house of the deceased, the defendant rode a black horse, Avery the defendant's roan mare, and witness the mare he had been ploughing. They rode up in front of the house and defendant fired into it with his shot-gun, and the deceased hallooed "O Bunk" three times. Avery advanced on foot close to the deceased, and fired twice with his pistol. Witness remained on his horse; Avery and the defendant dismounted. After the shooting they all left.

The witness stated that the shot-gun had been bought by the defendant, a considerable time before the murder, at Jewett, a village about fifteen miles distant. The defendant brought it home and kept it hid in the corn-crib, wrapped up in a blanket. After the killing, he put it near a stream called Lick Branch, and afterwards told witness where it was and asked him to take it out of the country. He left

$5 with witness's wife, and the next morning came and told witness to leave, and that he (witness) was in danger of being killed. Witness, on starting to Louisiana, moved the gun to a different place from where the defendant put it after the killing, and while in jail told Esquire Gregory where it was hidden. He was with the defendant at Jewett when it was purchased and paid for out of a fifty-dollar note, which the merchant held up and examined, remarking that they always noticed bills of that size. Witness could not recognize the State's witness Levy as the merchant who sold it, but believed him to be the man, on account of his (Levy's) remembrance of the circumstances. Witness saw Levy at the jail.

This witness was subjected to a searching cross-examination, in the course of which he denied several declarations imputed to him by the defence, and as to some of which he was contradicted by witnesses for the defence. He stated that he did not remember seeing Pete Williams the night of the conversation at the board-pile between himself, Avery, and the defendant, and knew he did not speak to Pete on that occasion. He acknowledged that he " had had some words " with the deceased. The morning after the killing, the defendant came to witness's house before day, and told witness that Bill Simms was killed and he wanted him (witness) to go down there. Witness said he already knew that Bill Simms was killed, having seen it done. Witness cried when he saw Bill dead; "it hurt me to see him; I felt badly; I did not feel that I had done any crime." Witness did not hold the horses for the defendant and Avery when they killed the deceased, but thought they held their bridle-reins over their arms. Avery went over the fence. It was a dark night, but there was a light in the deceased's house. Witness was at the meeting-house on Sunday after the killing, and there denied knowing anything about it. His shoulder was examined there, — for the purpose, inferentially, of seeing whether it showed such a bruise

as the recoil of a gun might make. "Before I left for Louisiana I did not know that I was suspected by the officers, I said I was in danger of my life. I thought they were afraid I would divulge something. Bunk Simms (the defendant) threatened me."

M. Levy, for the State, remembered selling a gun at Jewett to two men, but could not identify Plummer and the defendant as the men. It was paid for out of a fifty-dollar bill, handed to witness's brother, who held it up and looked through it. The taller of the two men was the purchaser. (Defendant was taller than Plummer.) A gun being shown witness, he said that the gun he sold to the men was of that kind.

Esquire Gregory, testifying for the State, identified the gun in court as a gun found hidden at a place described to him by Plummer.

Pete Williams, for the State, testified that he worked some land for the defendant, and one night about a month before the murder he went to the defendant's to see him about some ploughing. Before reaching the defendant's house, witness heard some one talking, and, supposing they were talking about him, went near them and recognized the voices of the defendant and Plummer. Witness heard the defendant say to Plummer, "I want you to do that work for me. Bill won't leave, and I can't leave. If I can't get anybody to do the work for me, I will do it myself." Plummer said, "When I tell a man I will do a thing, he may rely on it." They were near a board-pile, and witness was between it and a corn-pen. He could not remember all they said. Some time before that, witness went to get some meat from the defendant, who said he had none, but would kill a hog. While waiting there, Avery said to the defendant, "That fellow came down to my house last night and cursed and abused me." Defendant said, "Night didn't have no eyes, and that was the time to settle such matters." Just before sunset in the evening of the murder, the defendant came

into the field where Plummer, Avery, and witness were at work, and after first going to Avery, and next to Plummer, he came to where witness was, and said it was carelessness in witness to let the mules get away, and that he had looked for them in every place but one; and then he went back to Avery and Plummer, and they took out their horses and left the field. Just about dark, and immediately after witness had got his supper, he heard the report of a gun in the direction of Bill Simms's, the deceased, whereupon he went near Plummer's house and got over into a lane, and heard Avery say to Plummer, "We have done a good night's work;" to which Plummer replied, "Yes." Avery said, "I will go up and see where old Pete (witness) is; he is always prowling around. I will ask his wife about my washing." Witness then ran home and got there before Avery, who came up whistling, and asked witness's wife about some washing. Witness has heard the defendant say that his brother Bill (the deceased) was a d—d rascal, and that they could not live together; and knew that they passed each other without speaking, for months prior to the murder.

On his cross-examination, the witness said that he saw no one at the board-pile but the defendant and Plummer, and that Plummer spoke to him and said, "Hello! Pete; are you just from home?" to which witness replied, "Yes." Then Plummer said, "Did you hear what me and Bunk said?" and witness answered, "No; only something about ploughing." Witness acknowledged that he was examined at a meeting the Sunday after the murder, and that he then denied knowing anything about it. James (known as Bony) Simms was the first person to whom witness told what he knew, and that his brother (the defendant) was in it. They asked witness why he had not told about the plot before the deceased was killed, and he told them he had informed Bill Simms himself about it before the murder. After the death of the deceased, the defendant said to wit-

ness, "By G—d, I want you to leave my place; they tell me you won't work," and wanted witness's wife to let him drive witness off. This witness denied having had a certain conversation with J. Reeves soon after the murder, and was contradicted by Reeves as a witness for the defence.

Other witnesses were examined for the State, but the testimony already stated is believed to cover substantially the case made against the defendant. Gregory, for the State, testified that he and others found the gun in a brush-pile to which they were directed by Plummer. Pollock, a witness for the State and a neighbor of the deceased, happened to be riding towards the latter's house when the gun was fired, and, knowing that the deceased had no gun, he hurried on and was the first to find the body, and immediately aroused the neighborhood. As he got near the deceased's house he saw some one riding off on the defendant's roan mare, but did not recognize the rider.

For the defence a witness named Hooper testified that Plummer, while in jail, told him that the defendant came to him (Plummer) and drew a revolver and forced him to go with him; that he got an opportunity and ran away, and was fifty yards off when the shooting was done, and did not know who fired either the gun or the pistol. On cross-examination, the witness stated that Plummer did say something about the defendant forcing him to leave, and that he would not have left if he had not been compelled to do so. He also said something about $5 to leave on, and something about $200 being offered for the killing of the deceased.

J. A. Scarborough and other witnesses for the defence contradicted Plummer in regard to conversations imputed to and denied by him. Tom Wills testified that Plummer requested him to go and see if the deceased would not make friends with him, and he communicated to Plummer the deceased's reply that he would not make friends with a d—d thief. Plummer had denied this conversation with Wills.

James C. Simms, a brother of the deceased and the de-

fendant, testified that he lived three and a half miles from the deceased, and was informed of it by the defendant and one Deavers the night it happened. Witness and the defendant went to the deceased's that night. When they got there, Mr. Parsons said for them not to go into the yard until Esquire Gregory should arrive. Defendant did not dismount. Witness was close to the defendant all the time they were there, and heard every word he said, and contradicted a witness for the State who had testified that the defendant, while there, suggested that the deceased might have been hooked by a cow. Plummer ran away after the murder; the defendant stayed at home.

The defence introduced other witnesses who testified to statements by Plummer and Pete Williams inconsistent with their testimony. It was in proof that search for tracks was made around the premises of the deceased, but the only horse-track identified seems to have been that of the mare used by Plummer, and the only man's track that of Avery, who was a cripple. His track, where seen, was fifty or sixty yards from the house.

The opinion of the court discloses other matters relevant to the rulings. The jury found the defendant guilty of murder in the first degree, and he was adjudged to suffer death.

*Farrar & Prendergast*, and *Herring, Kelley & Pickens*, for the appellant, discussed the evidence in a brief and argument of much ability and force.

*Thomas Ball*, Assistant Attorney-General, for the State.

WINKLER, J. The appellant was prosecuted and convicted on an indictment which charges the murder of one William Simms, as having been committed in Limestone County, on May 31, 1878.

The first count in the indictment charges the murder upon

the defendant, " W. W. *alias* Bunk Simms." The second count charges that the murder was committed by one J. T. Plummer and the defendant, in which the defendant is also charged as an accomplice of Plummer in the murder. The defendant, on his arraignment, pleaded not guilty, and on a trial below was convicted of murder in the first degree, the jury having returned their verdict in the following form : "We, the jury, find the defendant guilty as a principal, and guilty of murder in the first degree." Judgment of the court was entered upon the verdict, declaring that the defendant should suffer the penalty of death. Motions for a new trial and in arrest of judgment were made, which being overruled, an appeal is prosecuted to this court on the following assignment of errors committed on the trial : —

1. Because of error in the court in refusing to give the charges asked by defendant's counsel, and refusing a new trial on account of said error.

2. Because the court erred in refusing to grant a new trial because of this error contained in the charge of the court, to wit : " To corroborate means to strengthen, to give additional strength to, to make more certain ; and the corroboration may be as to facts testified to by the accomplice, or as to other and different facts tending, in either case, to connect the defendant with the crime committed."

3. Because the court erred in refusing to set aside the verdict of the jury because the same is contrary to the law and the evidence.

4. Because the court erred in refusing to set aside the verdict on account of prejudice of the juror, whose name was unknown, who, as shown by the affidavits of J. A. Brackett and E. J. Simms, stated in substance, before the jury was empanelled, that " if he was taken on the jury he would hang that man," referring to the defendant, W. W. *alias* Bunk Simms.

5. Because the court erred in overruling the defendant's motion in arrest of judgment.

It is worthy of notice that there is not in the entire transcript a single bill of exceptions to any ruling or action of the court during the trial.

Counsel for the appellant in their brief, on file, appear to treat the first and second errors assigned together, and "specially insist that the law as to the corroboration of the accomplice Plummer, and as to circumstantial evidence, was not correctly submitted in the charge of the court;" and they say: "The charge complained of and set out in the second assignment is, to say the least of it, ambiguous and confused. The jury may or may not have understood it. The probability is that they did not," etc. After a very careful and attentive perusal of the charge complained of, we are constrained to say that, in our judgment, it is not properly subject to the criticism made by the counsel. The charge on circumstantial evidence is as follows: —

"To warrant a conviction on circumstantial evidence alone, the circumstances must not only be consistent with the guilt of the accused, but inconsistent with any other rational hypothesis or conclusion. The circumstances relied upon must be consistent with each other and consistent with the fact intended to be established, and, when taken together, must lead to a satisfactory conclusion, and leave the mind without reasonable doubt as to the guilt of the accused. But when the evidence is in part circumstantial and in part direct, and, taken altogether, leaves no reasonable doubt of the guilt of the accused, he should then be convicted; otherwise, acquitted."

The charge on the subject of the testimony of an accomplice and the necessity of corroboration is as follows: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other testimony tending to connect the defendant with the offence committed; and the corroboration is not sufficient if it merely shows the commission of the offence, — that is, if it merely shows that a murder has been committed. The term "accomplice," as here used,

includes any one connected, in a criminal sense, with the offence committed, either as a principal or as an accomplice or otherwise. To corroborate means to strengthen, to make more certain, to give additional strength to ; and the corroboration may be as to facts testified to by the accomplice, or as to other and different facts tending, in either case, to connect the defendant with the crime committed. If the testimony of Plummer, the accomplice in this case, has been thus corroborated, and the evidence then, taken all together, leaves you without reasonable doubt as to the guilt of the defendant, you should return a verdict of guilty ; otherwise not guilty."

With reference to the charge on circumstantial evidence, we are of opinion the charge as given to the jury meets all the demands of the law as to the conclusive effect of that character of testimony in order to authorize a conviction upon it, even in a case depending alone upon circumstantial evidence. Under the charge, the jury could not have convicted the defendant unless they had believed that all the circumstances relied on were consistent with each other and with the defendant's guilt ; and not only so consistent, but also that the facts proved were wholly incapable of being explained on any other hypothesis consistent with reason and the innocence of the accused. It is the settled rule of this court that in a case depending alone on circumstantial testimony it is a part of the law of such case that the jury should be properly instructed as to the nature and character of that kind of testimony in order to warrant a conviction upon it alone. *Hunt* v. *The State*, 7 Texas Ct. App. 212, and authorities there cited. And it is also settled that the law does not require that a charge on circumstantial evidence, or on any other subject, should be couched in any particular set of words or phrases ; so that the ideas are sufficient, and so expressed as that the jury can readily comprehend the meaning of the language employed, the demands of the law will be satisfied. *Rye* v. *The State*, at the pres-

ent term, *ante*, p. 163.    It will be found, on examination, that in many adjudicated cases, when charges are in a certain specified form, the courts have held them as proper instructions to go to the juries, not so much on account of the form, but because the court had not given the substance in charge.

With reference to the charge as to the testimony of the accomplice, we are of opinion that it was not calculated to have the effect on the minds of the jury contended for by counsel.    The charge embodies the substance of the law as found in the Code of Criminal Procedure, art. 623 (Rev. Code Cr. Proc., art. 741), as follows: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offence committed, and corroboration is not sufficient if it merely shows the commission of the offence."    But it is insisted on behalf of the appellant that there were matters immaterial to the issue given in evidence by the accomplice, and that he was contradicted in material matters by other witnesses, and that under the charge the jury might have deemed the corroboration in immaterial matters a sufficient corroboration of the accomplice to so strengthen and support his testimony as to have induced the verdict of guilty.    It will be seen by the charge as copied above that the court gave a charge which we deem to be sufficient on the subject of circumstantial evidence, followed by a charge on the subject of accomplices, and gave then a correct definition of the term *accomplice* when used with reference to a witness as not being sufficient to convict upon, unless corroborated by other testimony, which has been settled to mean those who have participated in the commission of the offence, by numerous decisions both of the Supreme Court and of this court, and gave a substantially correct definition of the meaning of the term *corroborate;* and following these instructions, and in immediate connection therewith, the following: " If the testimony of

Plummer, the accomplice in this case, has been thus corroborated, and the evidence then, taken all together, leaves you without reasonable doubt as to the guilt of the defendant, you should return a verdict of guilty; otherwise, not guilty." We are of opinion this instruction was a plain and appropriate application of the law to the facts proved, with one exception hereafter to be noticed more particularly. If there was irrelevant testimony admitted without objection, and there was also material testimony adduced on the trial, the introduction of immaterial testimony would not, of itself, require the reversal of the judgment. The Supreme Court, in *Burton* v. *The State*, 21. Texas, in considering a similar subject to the one here presented, uses the following appropriate language :—

" The question here presented is, that when the testimony of an accomplice is corroborated in numerous important and material parts of his evidence, will the admission by the court of a corroboration in an immaterial part vitiate the verdict found by the jury upon the whole of the evidence. No authority has been found establishing such doctrine. Indeed, it would often be almost impossible to permit a corroboration in a material part without at the same time permitting it in an immaterial part." It was also said in Burton's case, that " a case might happen that an undue importance might be attached to a corroboration in immaterial matters, by which the jury would be misled." Have we not here presented just such a case?

Neither the provisions of the Code nor the decisions of the courts have defined precisely what is *material* and what *immaterial* corroboration in such case, or the source from which the corroborating testimony must come, any further than as expressed in the statute, copied above, which requires that it be " evidence tending to connect the defendant with the offence committed." *Myers* v. *The State*, 7 Texas Ct. App. 640. So it would seem (as seems to have been the opinion of the judge who delivered the charge

under consideration) that whether the other evidence corroborated the statements of the accomplice, or not, was a matter of no consequence, so it tended to connect the defendant with the offence committed. If the corroborating testimony, of itself, tends to connect the defendant with the commission of the offence for the commission of which he is on trial, it would be such corroboration as the law recognizes, whether the corroborating facts have been specifically testified to by the accomplice or not. The nearest that the courts have come to deciding what is material is that found in *Coleman* v. *The State*, 44 Texas, 109, where it was held as follows: " It is not enough that the evidence of an accomplice be corroborated by other testimony as to one of several parties charged with the offence ; the confirmation should be on some fact which goes to fix the guilt on the particular person on trial." See the authorities cited in Coleman's case.

It has been said that the supporting evidence need not be sufficient to convict upon ; for in such a case there would be no need of using the testimony of an accomplice. *Nourse* v. *The State*, 2 Texas Ct. App. 317, where the Supreme Court of California is cited as having held " that the corroborating evidence may be slight, and entitled to but little consideration ; nevertheless, the requirements of the statute [similar to ours] are fully fulfilled if there be any corroborating evidence which, of itself, *tends* to connect the accused with the commission of the offence." In Burton's case, cited above, it was said of the testimony of an accomplice and the charge of the court, that " this must, of course, be in a material matter. And the court so charged the jury." But it is not seen that the decision turned upon the charge of the court. The court said, however: " Our Code establishes the rule in accordance with what is the practice of the courts generally, requiring the testimony of an accomplice to be corroborated in some matter connecting the defendant with the commission of the offence." We

are of opinion the corroboration must tend, not remotely, but directly and immediately, to connect the person against whom it is offered with the commission of the offence. *Jones* v. *The State*, 7 Texas Ct. App. 457.

Without pursuing this inquiry further, our conclusions are that when the court shall have charged the jury on this subject in the language of the statute, substantially, it would ordinarily be sufficient, so far as the charge is concerned; and whilst the law would not sustain a conviction on the testimony of an accomplice alone, its demands would ordinarily be satisfied if there was other evidence adduced which tended to connect the defendant with the offence committed, restricted as was done in the present case; but that the corroboration would not be sufficient if it merely shows the commission of the offence, — that is, that in this case a murder had been committed. With the exception of this restrictive quality, there is no material difference between the common-law rule and that prescribed by the Code.

We are therefore of opinion the court did not err, either in the charge as given to the jury on the two subjects of circumstantial evidence and accomplices, or in refusing to give the instructions asked by the defendant's counsel, with a single exception, which would not generally arise. In one of the charges asked by the defendant it is assumed that a State's witness named Peter Williams was also an accomplice as well as the witness Plummer, and the court was asked to charge that one accomplice could not support another, but that both must be corroborated by other testimony. The judge, in refusing the special instructions, says, with reference to this witness: " There is not a particle of evidence even tending to make him a *particeps criminis*." In our examination of the evidence as set out here, we find nothing to contradict the view expressed as to the witness Williams. So that whilst the charge refused may announce a correct rule of law, abstractly considered, it would have been error to have given it in the present case; because

not applicable to the facts of the case. The charge is a carefully worded instruction to the jury upon every legitimate view they could take of the testimony, and, except in one instance, as an enunciation of the law arising upon the facts, was substantially correct.

Passing for the present the third assignment of error, we notice the fourth error assigned.

It is urged in the motion for new trial that one of the persons who sat on the trial stated, before he went upon the jury, that if taken on the jury he would hang that man, referring to the defendant, and two affidavits were filed in support of the motion, the two affiants stating that they did not know the name of the person. The prosecuting attorney filed, in opposition to the affidavits filed in support of the motion for a new trial, affidavits to the effect that the affiants supporting the motion were incredible persons, and not worthy of belief.

An affidavit was also filed by one Griggs, apparently the juror in question, who states he remembers saying, in a jest, to one of the defendant's attorneys, about this: that he (Griggs) was a contrary sort of fellow, and that he (the attorney) had better not take him (Griggs) on that jury, and might have said that if he did, he (Griggs) would hang him (Simms), but does not recollect having said so; says that he had formed no opinion as to the guilt or innocence of the defendant; did not know him or the deceased, and arrived at his conclusion as to the guilt alone from the testimony, and the law as given by the court.

It appears from the transcript that when the motion for a new trial was being heard, the State took issue with the defendant, under authority of art. 181 of the Code of Criminal Procedure, which provides that " the State may take issue with the defendant upon the truth of the cause set forth in the motion for a new trial, and in such case the judge shall hear the evidence, by affidavit or otherwise, and determine the issue." This is a new provision, adopted for

the first time as a part of the Revised Codes, which, it seems from the dates, went into effect between the time of the trial and the time of hearing the motion. The court heard the motion and the testimony both by the affidavits filed and by oral testimony, a statement of which is set out in the transcript. From the statement of the evidence, it appears that what the juror said before the trial was done in order to avoid being taken on the jury. It appears that the remarks, whatever they were, were probably made in the presence and hearing of one of the counsel for the defendant. The court overruled the motion, and so far as this ground of the motion is concerned we are of opinion the testimony sustains the action of the court.

It may not be amiss, in this connection, to notice a supposed error in the proceedings, which is presented for the first time in this court, to the effect that the defendant was entitled to the ameliorated punishment provided for in the Revised Penal Code, which provides that " the punishment for murder in the first degree shall be death, or confinement in the penitentiary for life." This is not now an open question in this court. In a case decided, as in the present case, the Revised Codes had gone into effect and become the law in this State after the trial and conviction. This was the case of *Walker* v. *The State*, 7 Texas Ct. App. 245. In that case, counsel for the appellant, Walker, who had been convicted of murder in the first degree, and his punishment affixed at death, which was the only punishment for murder of the first degree known to the law at the time of his trial, took the position and maintained it, in a brief which commanded the most thorough examination from the court on account of its marked ability and the zeal with which it was prosecuted, that, inasmuch as the change in the law had gone into effect during the pendency of the appeal, the defendant was entitled to the amelioration of the new provision. After a patient and thorough consideration and comparison of the different statutory provisions, it was held

that sect. 6 of the final title of the Revised Statutes con-
trolled, and that, agreeably to the provisions of that article,
the law in force at the time of the trial was the law of the
case.    In the present case the trial was concluded, the ver-
dict rendered, and judgment entered, on or prior to the
twenty-fourth day of July, 1879, which is the day on which
the Revised Penal Code went into effect and became a law,
agreeably to the published copy printed and published by
authority of the State; but the trial was had, the defendant
had been arraigned and had entered his plea, the jury had
been empanelled and sworn, the witnesses had testified, the
court had charged the jury, and the jury had taken the case
and had retired to consider of their verdict, under the old
law and while its provisions were in full force.    So that, on
the authority of Walker's case, the change in the law did not
affect the case in any way beneficially to the defendant.
There was no error in overruling the motion in arrest of
judgment.

    Returning to the third assignment of error, — viz., the
refusal of the court to grant a new trial because the verdict
is contrary to the law and evidence, — we are constrained to
say that the testimony, as set out in the statement of facts
in the transcript, is not satisfactory.    The testimony of the
witness Plummer, a conceded participant in the murder to
an extent at least requiring corroboration, was extended, on
cross-examination, to many matters of an apparently im-
material character, for the purpose of contradicting his te's-
timony by that of other witnesses; and the same may be
said as to the witnesses introduced for the purpose of cor-
roborating the accomplice; and in this manner there was a
mass of testimony before the jury, some of which tended to
connect the defendant with the commission of the murder,
and much of which had no such tendency, that we can per-
ceive.    We are not certain, in view of these peculiar circum-
stances, that the charge of the court sufficiently cautioned
the jury against attaching undue weight to these unimpor-
tant and immaterial matters of inquiry, and in confining the

jury strictly to a consideration of the facts in evidence, which tended to fix the guilt upon the defendant. The evidence upon which the guilt of the defendant depended being so largely circumstantial in character, and in view of the danger of the jury being misled by this mass of testimony having no direct bearing upon the vital point in the case, we are unable to see that the jury have not found their verdict upon the testimony of the accomplice, unsupported and not corroborated by other testimony which, of itself, tended to fix guilt upon the defendant. In seeking among the testimony other than that of the accomplice, Plummer, we are unable to point out the particular facts testified to by other witnesses which connect or which tend to so connect the defendant with a participation in the murder of the deceased as that it would be safe to permit the conviction to stand, and become a precedent in the adjudication of similar cases hereafter. On another trial, should the testimony be the same, or similar to that of the present, the attention of the court is specially directed to the necessity of confining the jury, in their deliberations, to the testimony which tends to connect the defendant with the offence committed, to the exclusion of those phases of the testimony which have no such tendency.

Because of the uncertainty of the testimony, and because of the liability of the charge to have misled the jury to the prejudice of the defendant, the judgment must be reversed and a new trial awarded.

*Reversed and remanded.*